No. 39.—JAMES L. TERRY, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] Notwithstanding the Court may charge the Jury generally, as to the various grades of homicide; still, it is the right of the defendant to ask specific instructions as to any particular point, provided there is proof to warrant it.

[2.] Under the New Trial Act of 1853–4, the defendant is not called upon to show, affirmatively, that injury has resulted from the refusal of the Court to give a legal charge as requested; the Statute assumes that damage is done, and will listen to no allegation to the contrary.   It makes the refusal to give a legal charge, when requested, and the granting a new trial, convertible terms.

Indictment for murder, in Muscogee Superior Court.    Tried before Judge WORRILL, June Adjourned Term, 1854.

The Jury in this case found a verdict for "Involuntary manslaughter in the commission of an unlawful Act."    A motion was made for a new trial, and the refusal to grant the rule *nisi* is the only error assigned in this Court.

The *first* ground for a new trial was—

1. Because the Court erred in charging, that if the prisoner, with malice aforethought, either express or implied, slew the

·deceased, he was guilty of murder.   The Court certified, as to this ground, that he had previously fully and carefully explained to the Jury every grade of homicide.

·2. That the Court erred in charging the Jury, that they should find the prisoner guilty in several supposed state of facts—in no one of which was the Jury instructed, that in order to find the defendant guilty, it was necessary it should appear that the offence was committed prior to the finding of the bill, and within the County of Muscogee.

3. Error in charging, that if deceased assaulted or attempted to assault or commit a serious personal injury on the prisoner, and the prisoner, in the sudden heat of passion, thereupon slew the deceased, then the prisoner was guilty of voluntary manslaughter.

4. In refusing to charge as requested, as follows: That if the deceased and prisoner alighted with a common intent to fight, and prisoner killed the deceased with a knife; yet, if when prisoner drew his knife, he apprized the deceased of it, and abandoning the intent to fight, did not advance on deceased, but threw himself on the defensive, and the deceased advanced upon the prisoner and struck him with a chunk or stick, before prisoner used his knife, and they should believe that prisoner used the knife in defending himself against such blow, then he was not guilty of the crime of murder, with which he was charged.   (The Court certified that he refused to charge *in these words*, because the evidence did not show the facts to exist as alleged in the request.)

5. Error in rejecting the evidence of one Motly, that Wilson, one of State's witnesses, declared to him on one occasion, that the prosecutor, Doles, owed him some money, and if he did not pay him he would turn a Terry man; and that he knew more in favor of Terry than he did against him.   (The Court certified that no foundation was laid for this impeachment.)

6. The discovery of new evidence, viz: of Sarah J. Windham—that she heard Mary Perry, one of State's witnesses, say,

a few days before the trial, that the killing was a pure accident, and prisoner was obliged to do what he did.

7. The newly discovered evidence of Silvanus Prince, to prove circumstances going to impeach one of the witnesses of the State.

The two last grounds were supported by affidavits.

8. The mistake of three of the Jury as to the verdict rendered—they supposing it was for "Involuntary manslaughter in the commission of a lawful act, without due caution and circumspection."

This ground was sustained by the affidavits of the Jurors.

The refusal to grant a rule *nisi* is the error assigned.

Judge BENNING having been of Counsel, did not preside in this case.

COLQUITT & WELLBORN, for plaintiff in error.

Sol. Gen'l BROWN, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] In the progress of this trial the Court was requested, by Counsel for the prisoner, to charge the Jury, "that if they believed that the deceased and prisoner alighted with a common intent to fight, and that prisoner killed deceased with a knife; yet, if, when prisoner drew his knife he apprized the deceased of it, and abandoning the intent to fight, did not advance on the deceased, but threw himself on the defence, and the deceased advanced upon the prisoner and struck him with a chunk or stick, before the prisoner used his knife; and they should further believe, that prisoner used the knife in defending himself against such blow, then he was not guilty of the crime of murder with which he was charged."

This charge the Court refused to give on two grounds—1st. Because it assumed a state of facts which did not exist; and

2dly. Because he had charged the Jury already, as to the law, generally, regulating the various grades of homicide.

[2.] It is scarcely necessary, we apprehend, to discuss the sufficiency of the last reason assigned by the Circuit Judge, for refusing to give the charge requested. For notwithstanding he may, at the beginning of his charge, have instructed the Jury generally, upon murder, manslaughter and justifiable homicide; still, it was the right of the prisoner to ask a specific charge upon the point to which the attention of the Court was called, provided there was any proof in the record to warrant it. His Honor, Judge CRAWFORD, held that there was not; hence, it becomes necessary to refer to the evidence upon this point; and the only difference of opinion which could exist between Counsel and the Court, must have been as to one fact, namely: whether there was any proof that the defendant had abandoned his purpose to fight. And to ascertain this, we propose to refer to the testimony of a single witness only.

Mr. John B. Redding, the only person present with the parties when this rencontre took place, says, "that about 2 o'clock, P. M. on 2d day of June, 1850, witness and deceased were riding the road together. Prisoner came up in a buggy, behind, in a fast trot, and as prisoner passed, *deceased told prisoner* "*not to ride so close to them.*" Prisoner observed, "he be d——d if he did not drive over him, if he wanted to." Deceased replied, "You had better try it then." Prisoner repeated what he had said before. Deceased then cursed prisoner. Prisoner then asked deceased if he wanted a fuss? He replied, that "he had as leave have one as not." Both dismounted—as prisoner got out of his buggy he said, with an oath, that "he never backed out of a fuss." They stripped off their coats—while deceased was putting his down, prisoner took his knife out of his pocket and opened it. Prisoner then said, "come ahead, I am ready." Deceased then walked up to prisoner and said, "I suppose you have drawn your knife?" Prisoner replied, "*Yes I have.*" Deceased then picked up an old piece of chunk and struck prisoner on the arm, as he threw it up to ward off the blow, and the chunk fell out of deceased's

hands. Prisoner then began to make licks with his knife and made several; *when prisoner struck deceased with his knife he broke loose from deceased, who had hold of prisoner by his arm and shirt, and ran. As prisoner jerked away from deceased his shirt was torn.* Deceased followed after prisoner and threw the black-jack chunk at him and struck him between the shoulders, which broke his gait in running. After prisoner dismounted from his buggy, he walked off a piece, so that deceased was nearer the buggy than prisoner when prisoner told him to come on—*thinks prisoner remained standing and deceased advanced towards prisoner.* They met about ten steps from the buggy—were four or five steps apart when deceased observed to prisoner, you have drawn your knife. After the affair was over, witness remarked to prisoner, "your fuss has turned out just as I expected." Prisoner replied, "I did not want to cut him but he was too large for me." The knife used was a common size Congress knife.

Thus it will be seen, that after Mr. Terry got out of his buggy and drew his knife, exhibiting it openly to the deceased, he made no aggressive movement upon his adversary. Might not the Jury have inferred, taking into consideration the great difference in the relative manhood of the combatants, that Terry, having gone thus far to maintain the appearance of courage, became *irresolute*, at least to the extent of making no assault upon his foe—and that his final purpose was to stand altogether upon the defensive? And is not this inference not only deducible, fairly, from what preceded the conflict, but still further strengthened from what followed? Just so soon as he could extricate himself from the deceased, after receiving and inflicting the first blow, he turned and fled, and that, too, notwithstanding he still retained his knife? Man does not differ from the lower order of creation, so far as his animality is concerned. And if he desires to study himself in this respect, let him go to the beasts of the field and the fowls of the barn-yard to learn wisdom. Who has not witnessed the hostile advance of the boar—the bull and the cock? With what seeming defiance they approach each other, when upon the eve of collision—the

courage of the weaker or more timid fails, and after parrying the onset, or perhaps without waiting to receive it, the bold braggart turns and flees.

Such the Jury might well have believed was the true construction to be put upon this transaction.   And if so, the charge requested was legal—being warranted by the proof; and the Court was bound to have given it.   The New Trial Act of the last Legislature is explicit and imperative upon this subject. *(See Duncan's Digest of the Acts of* 1853–4, *p.* 16.)

But it is argued, that inasmuch as the Jury returned a verdict for manslaughter and not murder, that the refusal of the Court to charge in relation to the higher offence, could not have prejudiced the prisoner—this may be true; still, if the charge was authorized by the pleadings and the proof, there is no discretion left to the Courts.   A new trial must be awarded, whether any injury has been done or not.   The law, in such case, presumes injury. This case has been analogized to that of Boyd, disposed of at the present term.   The distinction between the two is plain and palpable.

In Boyd's case, it was conceded that the Court erred as to the law relative to manslaughter; and further, that manslaughter, as well as murder, was put in issue by the *pleadings* in Boyd's case.   But it is also true that there was not before the Jury a particle of *proof* to justify a verdict for manslaughter. Hence, we refused to send the case back, to give the Jury an opportunity to find contrary to law, when they had found in accordance with it.   Terry's case is like Boyd's in this—the indictment being framed and found for murder, put in issue upon the trial every grade of homicide.   But it differs from Boyd's in this: not only is manslaughter, about which the Court refused to charge, and as to which there was some proof, put in issue by the pleadings, but by the proof also.   And therefore, it was the privilege of the defendant to have the benefit of the charge requested.

By the refusal of the Court to instruct the Jury, that if the facts existed which the request assumed, and which, in the

opinion of this Court, the Jury had a right to infer did exist, the offence could not be murder, the Jury might have doubted whether they ought not to have convicted the prisoner of murder, and therefore would the more readily have rendered a verdict for the highest grade of manslaughter. And thus the defendant may have been, and probably was, damaged.

But we are not called upon to show, affirmatively, that injury was done. The New Trial Act assumes, that under such circumstances, injury is done, and will not listen to any allegation, to the contrary. We may be satisfied that the verdict is right. *We are fully satisfied that it is*—still, we have no discretion—our hands are tied by the last Legislature. The refusal to give a legal charge when requested, and the granting a new trial, are made, by the Act of 1853–4, convertible terms.

If told, as we have been, by the able and zealous Counsel who have argued these cases, that in Boyd's case the Jury might have fallen back upon the crime of manslaughter instead of murder, had they not been instructed that no such offence existed, we re-iterate, the evidence did not allow to them this privilege. Neither the Jury, in a civil or criminal case, nor any human tribunal, nor any other being, has the right to do wrong. And it would be both legally and morally wrong in this or any other Court to award this privilege.

Upon the foregoing ground, then, alone, we are compelled to grant a new trial, however unwilling we may be to disturb this verdict.

From the present excited state of public opinion, defendants who are convicted need expect little from Executive or Legislative clemency. Consequently, it becomes the solemn duty of the Courts to watch with the greatest circumspection over State trials, and to see to it not only that no acknowledged right is withheld, but that the benefit of a reasonable doubt, either *as to the law* or the facts, be given to the accused. And if error be committed, let it be on the side of mercy, rather than of justice. The Coronation Oath of the British Sovereign constrains even the monarch on his throne to administer the

law in mercy—and the official oath of every Judicial functionary, high or low, contains, expressly or impliedly, the same obligation.   It is Heaven's law, and Earth need not be ashamed to imitate the example.